# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Armando Valles, et al., | CV-08-09-TUC-FRZ (JCG) |
| Plaintiffs, | **REPORT & RECOMMENDATION** |
| vs. | |
| Pima County, et al., | |
| Defendants. | |

Pending before the Court is a Motion for Partial Summary Judgment filed by Plaintiffs on October 15, 2010. (Doc. 276.) Defendant Pima County filed a response and Plaintiffs timely replied. (Docs. 286, 292.)

Also pending before the Court is a Motion for Summary Judgment filed by Defendant Pima County on October 18, 2010. (Doc. 279.) Plaintiffs filed a response and Pima County timely replied. (Docs. 284, 288.)

Pursuant to the Rules of Practice in this Court, the matter was assigned to Magistrate Judge Guerin for a Report and Recommendation. (Doc. No. 37.) The Magistrate recommends that the District Court, after its independent review of the record, enter an order denying Plaintiffs' Motion and granting Defendant's Motion.

///

///

///

///

///

## FACTUAL AND PROCEDURAL BACKGROUND

On November 18, 2003, Pima County approved a final plat for "The Enclave at Gates Pass," comprised of 21 lots and a common area ("The Enclave"). (DSOF 1; PRSOF 1.)[1] The Enclave's original developer was West Speedway Partners, LLC ("WSP"). (DSOF 2; PRSOF 1.) The final plat was signed by the Chair of the Pima County Board of Supervisors and refers to a third-party trust agreement ("Initial Assurance Agreement"), which was "provided to guarantee improvements as required by the Pima County Zoning Code, Chapter 18.69 (Subdivision Standards) in this subdivision." (DSOF 3; PRSOF 1.) The final plat and the Initial Assurance Agreement were approved and effective November 18, 2003 and recorded January 7, 2004. (DSOF 4; PRSOF 1.)

The parties to the Initial Assurance Agreement were the County, WSP and Fidelity National Title, the trustee of the trust that held title to the property constituting the Enclave. (DSOF 5; PSOF 2.) The Initial Assurance Agreement provided that it was "submitted as an assurance that Subdivider [WSP] will construct the Subdivision Improvements, as required by A.R.S. § 11-806.01 and Pima County Zoning Code Chapter 18.69." (DSOF 6; PSOF 3.) WSP was required to complete all subdivision improvements, including streets, utilities and drainage and flood control improvements, by November 18, 2007. (DSOF 7; PRSOF 3.) The trustee was prohibited from conveying title to any of the lots until Pima County provided a written Release of Assurance. (DSOF 8; PRSOF 3.) The Initial Assurance Agreement provided that WSP could "submit substitute assurances in a form and amount acceptable to County at any time during which [WSP was] not in default under this agreement." (DSOF 9; PRSOF 3.) The Initial Assurance Agreement provided that the execution of a substitute assurance agreement would terminate the Initial Assurance Agreement. (DSOF 10; PRSOF 3.)

---

[1] Citation to the parties's statements of fact are as follows: Plaintiffs' Statement of Facts in Support of Motion for Summary Judgment (Doc. 277), "PSOF." Defendant's Response to Plaintiffs' Separate Statement of Facts (Doc. 287), "DRSOF." Plaintiffs' Separate Statement of Facts in Reply to Defendant's Responsive Statements (Doc. 293), "PRDRSOF." Defendant's Statement of Facts in Support of Motion for Summary Judgment (Doc. 280), "DSOF." Plaintiffs' Response to Defendant's Separate Statement of Facts (Doc. 285), "PRSOF."

On April 20, 2004, WSP and ML Parkhurst Construction entered into a contract for "a land improvement construction job subdividing a vacant raw land into 21 estate lots for sale including all necessary site works, such as earth work, road/paving work and utilities." (Doc. 280, Ex. 3.)  WSP agreed to pay ML Parkhurst $544,915.00 for the cost of the subdivision improvements.  (*Id.*)

In 2004, WSP sought to enter into a substitute assurance agreement.  (DSOF 11; PRSOF 3.)  On June 3, 2004, in order to allow WSP to obtain substitute assurances, Thomas Hosack, the Enclave's engineer, submitted an estimate of $696,813.00 for the cost of the subdivision improvements to Deborah Marchbanks, Pima County Subdivision Coordinator.[2] (DSOF 12; PRSOF 3.)  Marchbanks submitted Hosack's cost estimate to the Pima County Department of Transportation, which approved it on August 16, 2004.  (DSOF 14; PRSOF 5.)  On December 2, 2004, Pima County and WSP entered into a Substitute Assurance Agreement for Construction of Subdivision Improvements ("Substitute Assurance Agreement") with Pima County.  (DSOF 15; PRSOF 7.)   The Substitute Assurance Agreement terminated the Initial Assurance Agreement and allowed the transfer of title to the property. (Doc. 136-4.) The Substitute Assurance Agreement did not contain a limitation on transferring title to lots, but contained a provision that WSP would provide security to Pima County in the form of a bond in the amount of $696,813.00.  (DSOF 16; PRSOF 7.) In April 9, 2004, WSP had obtained a bond in the amount of $696,813.00 with Capitol Indemnity Corporation as surety.  (DSOF 17; PRSOF 7.)  The bond named Pima County as obligee, WSP as principal, and Capitol Indemnity Corporation as surety.  (DSOF 18, PRSOF 7.)

On December 14, 2004, a "Release of Subdivision Assurance Trust" ("Release") was recorded with the Pima County Recorder.  (DSOF 19; PRSOF 7.)  The Release referred to "substitute assurances in the form of a Performance Bond" and included the amount of the bond.  (DSOF 20; PRSOF 8; Doc. 280, Ex. 5.)  The Release provided that, based on the

---

[2] The Pima County Subdivision Coordinator is a liaison between the developer and the various Pima County agencies involved in the subdivision design review process.  (DSOF 42; PRSOF 42.)

1   provision of substitute assurances, the Pima County Board of Supervisors approved the

2   transfer of title to lots in the Enclave.  (DSOF 21; PRSOF 8.)  Following its standard

3   practice, Pima County did not record the Substitute Assurance Agreement.  (DSOF 45;

4   PRSOF 18.)

5        Plaintiffs purchased sixteen lots within the Enclave. (PSOF 2; DRSOF 2.)  At the

6   time of purchase, Plaintiffs knew the improvements were not complete.  (DSOF 64; PRSOF

7   43.)

8        On April 6, 2006, Plaintiffs sent a letter to Ms. Marchbanks detailing their concerns

9   about the lack of progress on the improvements. (PSOF 21; DRSOF 21.)  In response to the

10   April 6, 2006 letter, WSP assured Pima County that improvements would be complete within

11   ninety days.  (PSOF 22; DRSOF 22.)  WSP failed to complete the improvements.  (DSOF

12   22; PRSOF 9.) On August 24, 2006, Deborah Marchbanks notified WSP of her findings that,

13   pursuant to section 2.8 of the Substitute Assurance Agreement, WSP had failed to diligently

14   construct the required improvements and therefore was in breach of the Substitute Assurance

15   Agreement.[3]  (DSOF 23; PRSOF 10.)  In September, 2006, Deputy County Attorney Paul

16   Loucks sent a letter to Christina Tighe of Capitol Indemnity Corporation requesting Capitol

17   "perform its obligations as Surety" under the Bond. (DSOF 24; PRSOF 11.) On October 30,

18   2006, in order to resolve a dispute among the members of WSP, a Pima County Superior

19   Court judge appointed Glen Kerslake as receiver for WSP, with authority to complete the

20   improvements.  (DSOF 25; PRSOF 11.)  The County temporarily withdrew the bond claim

21   to allow Kerslake to complete the improvements.  (DSOF 26; PRSOF 11.)  In late 2006,

22   however, the County reinstated its claim on the bond. (DSOF 27; PRSOF 12.) Capitol stated

23   its position that the bond claim was premature.  (*Id.*)

24        On December 15, 2006, WSP filed for Chapter 11 bankruptcy.  (DSOF 28; PRSOF

25   13.)  After WSP's bankruptcy filing, the County elected to allow time to complete the

26   improvements through the bankruptcy, subject to Capitol's assurance that this would not

27

28        [3] It appears that Ms. Marchbanks sent this letter to the wrong address and it was never received by WSP.  (PSOF 24; DRSOF 24.)

4

prejudice the County's rights under the bond.  (DSOF 29; PRSOF 13.)  On July 31, 2007, WSP filed a plan of reorganization.  (DSOF 30; PRSOF 13.)  The bankruptcy court confirmed the plan on January 8, 2008.  (DSOF 31; PRSOF 13.)  The reorganization plan called for another entity, West Speedway Partners II, LLC ("WSP II") to complete the improvements.  (DSOF 32; PRSOF 13.)  The reorganization plan required WSP II to (1) obtain financing within ninety days after closing, (2) begin construction of the improvements within 150 days of closing, and (3) complete construction of improvements within one year after commencing.  (DSOF 33; PRSOF 13.)

WSP II filed for bankruptcy on July 8, 2009.  (DSOF 34; PRSOF 13.)  On August 25, 2009, the County again made a claim on the bond.  (DSOF 35; PRSOF 13.)  On April 28, 2010, Pima County entered into a settlement agreement with, among others, WSP II and Capitol, whereby Capitol agreed to pay the full sum of the bond into escrow in order to facilitate completing the improvements.  (Doc. 280, Ex. 16.)  The settlement was approved by a bankruptcy judge in WSP's bankruptcy proceedings over Plaintiffs' objections.  (Doc. 280, Exs. 17 & 18.)

The parties dispute whether work on the improvements is currently occurring.  (DSOF 38; PRSOF 14.)  Three of the Plaintiffs' lots have been sold at trustee's sales for significantly less than Plaintiffs' purchase price.  (DSOF 49; PRSOF 24, 25.)

Plaintiffs initiated this action by filing a complaint alleging various counts against numerous defendants on January 3, 2008.  (Doc. 1.)  After several amendments of the complaint and dismissals of various parties and claims by the Court, (*see, e.g.*, Docs. 182, 183), what remains at issue in this case are Plaintiffs' four claims against Pima County as alleged in Plaintiffs' Third Amended Complaint: (1) violation of the 5th Amendment takings clause; (2) violation of the 14th Amendment right to substantive due process; (3) gross negligence under Arizona law; and (4) promissory estoppel under Arizona law.

Plaintiffs move for partial summary judgment on their claims of substantive due process and negligence.  In support of their motion, Plaintiffs allege that they closed escrow in reasonable reliance on information presented in their Purchase Documents, and

1    representations made to them by WSP, its realtor, and its project engineer.  (Doc 284, p. 4.)

2    When WSP failed to complete improvements, the County had an obligation to make a claim

3    on the bond and complete the improvements.  (*Id.*)  The County's withdrawal of its demand

4    on the bond without further assurances and/or oversight of the "incompetent developer was

5    grossly negligent, in breach of its statutory and promissory duties" and was the proximate

6    cause of continued delays and Plaintiffs' damages.  (*Id.* at pp. 4-5.)   In addition, Plaintiffs

7    allege that the County had an obligation to inspect the properties and its failure to do so has

8    resulted in the developer cutting faulty grades and trenches, inappropriately dumping sub-

9    terrain rock on the lots, and causing vast destruction of expensive, protected vegetation.

10    (Doc. 276, p. 6.)  Plaintiffs allege the County's inaction has deprived them of the use of

11    enjoyment of their properties for more than five years.

12        Defendant Pima County moves for summary judgment on all claims.

13    **STANDARD OF REVIEW**

14        In deciding a motion for summary judgment, the Court views the evidence and all

15    reasonable inferences therefrom in the light most favorable to the party opposing the motion.

16    *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Eisenberg v. Insurance Co.*

17    *of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987).

18        Summary judgment is appropriate if the pleadings and supporting documents "show

19    that there is no genuine issue as to any material fact and that the moving party is entitled to

20    judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317,

21    322 (1986).  Material facts are those "that might affect the outcome of the suit under the

22    governing law."  *Anderson*, 477 U.S. at 248.  A genuine issue exists if "the evidence is such

23    that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

24        A party moving for summary judgment initially must demonstrate the absence of a

25    genuine issue of material fact.  *Celotex*, 477 U.S. at 325.  The moving party merely needs to

26    point out to the Court the absence of evidence supporting its opponent's claim; it does not

27    need to disprove its opponent's claim.  *Id.*; *see also* Fed. R. Civ. P. 56(c).  If a moving party

28    has made this showing, the nonmoving party "may not rest upon the mere allegations or

1    denials of the adverse party's pleading, but . . . must set forth specific facts showing that

2    there is a genuine issue for trial." Fed. R. Civ. P. 56(e). *See also Anderson*, 477 U.S. at 256;

3    *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995).

4         The ultimate inquiry is "whether the evidence presents a sufficient disagreement to

5    require submission to a jury or whether it is so one-sided that one party must prevail as a

6    matter of law." *Anderson*, 477 U.S. at 251.

7                                     **DISCUSSION**

8    **1.    Pima County is entitled to summary judgment on Plaintiffs' takings claim**

9         Examining Plaintiffs' allegations in the context of Fifth Amendment takings

10   jurisprudence is akin to working a square peg into a round hole. Nothing in this case

11   suggests that the County engaged in a taking of Plaintiffs' interest in their private property.

12        The Constitution prohibits "takings of private property ... for public use, without just

13   compensation." U.S. Const. Amend. V. Federal takings claims fall into three categories.[4]

14   A "paradigmatic taking" occurs when the government directly appropriates or physically

15   invades private property." *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). An

16   "exaction taking" occurs when the "government demands that a landowner dedicate an

17   easement allowing public access to her property as a condition of obtaining a development

18   permit." *See id.* at 546. A "regulatory taking" occurs if the government (a) requires an

19   owner to suffer a permanent physical invasion of her property ("*Loretto* taking"), (b) enacts

20   a regulation which completely deprives an owner of all economically beneficial use of her

21   property ("*Lucas* taking"), or (c) enacts a regulation that has such significant economic

22   impact on property that it is considered a taking ("*Penn Central* taking").[5] *See id.* at 538.

23   _____

24        [4] Plaintiffs rely on Arizona Constitutional law in support of their takings claim. (DSOF
     65; PRSOF 44.) However, because Plaintiffs' takings claim arises under 42 U.S.C. § 1983, the
25   Court has considered it in light of applicable federal law. Similarly, the Court gives no
     consideration to Pima County's claim that alleged negligence in applying regulations is not
26   enough to support a takings claim, because that argument is supported solely by citation to
     California state law. (Doc. 279, pgs. 6-7.)

27
         [5] The parties also devote some portion of their briefs to discussion of Plaintiffs' "de
28   facto" taking claim, in which the government's pre-condemnation activities decreases the value
     of private property; however, a "de facto" taking claim is more accurately referred to as a

                                          7

1    In the present case, the first two categories are clearly not at issue: Pima County has

2 not directly appropriated Plaintiffs' property, nor has Pima County attempted to exact an

3 interest in the property from Plaintiffs.  If a regulatory taking is at issue in this case, it does

4 not arise under *Loretto* or *Lucas*, because there is no evidence that Pima County has

5 permanently invaded Plaintiffs' property or that Plaintiffs have been deprived of all

6 economically beneficial use of their property.  At best, Plaintiffs allege something akin to a

7 *Penn Central* taking, *ie.* that Pima County's involvement in the assurances and refusal to

8 collect the bond monies upon WSP's default substantially diminished the value of Plaintiffs'

9 property such that a 5th Amendment violation occurred.[6]

10    Even in the context of *Penn Central*, however, Plaintiffs' takings claim defies logic.

11 *Penn Central* examines the economic impact of government regulation on private property

12 interests based on two primary factors: (1) the economic impact of the regulation on the

13 claimant, *ie.* the extent to which the regulation has interfered with distinct investment-backed

14 expectations and (2) the character of the governmental action, *ie.* whether it amounts to a

15 physical invasion or instead merely affects property interests through some public program

16 adjusting the benefits and burdens of economic life to promote the common good." *Penn*

17 *Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978).  Analysis of Plaintiffs'

18 claims under *Penn Central* is first stymied by the fact that there is no government regulation

19 at issue in this case.  In their response to Pima County's Motion for Summary Judgment,

20 Plaintiffs contend that Pima County caused their injuries by failing to record the Substitute

21 Assurance Agreement and by failing to timely ensure completion of the improvements.

22 (Doc. 284, pg. 7.)  Essentially, it is Plaintiffs' position that Pima County should have taken

23 action to circumvent the harm caused by WSP's botched development project and ensuing

24 bankruptcy.  Plaintiffs have not cited any authority to suggest that a government's *inaction*

25

26 regulatory taking claim.  *See Kaiser Development Co. v. City and County of Honolulu*, 913 F.2d
   573, 575 (9th Cir. 1990) ("A cause of action for inequitable precondemnation activities merely
27 states a type of regulatory takings claim.")

28    [6] To the extent Plaintiffs' claims arise from the County's failure to call the bond, those
   claims are moot, as it is undisputed that the County has released the bond and the bond proceeds
   are currently being applied to cover the cost of completing the improvements.

1    or *omissions* can amount to a taking, and this Court is not aware of any such case law.  To

2    the contrary, the takings cases discussed above all involve an affirmative, overt action by the

3    government – the adoption of a regulation, the implementation of a redevelopment plan, the

4    acquisition of an easement, etc. – that directly causes a diminution in private property values.

5    *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 216 F.3d

6    764, 783 (9th Cir. 2000) (in the takings context, the plaintiff must establish both

7    causation-in-fact and proximate causation).

8         Second, and more generally, conceiving of Plaintiffs' allegations as a takings claim

9    goes against the very purpose of the Takings Clause, which is to "prevent the government

10   from forcing some people alone to bear public burdens which, in all fairness and justice,

11   should be borne by the public as a whole."  *Palazzolo v. Rhode Island*, 533 U.S. 606, 618

12   (2001) (citing *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).   Takings Clause

13   jurisprudence addresses situations in which a government's "otherwise proper interference"

14   unfairly infringes on property interests.  *See Lingle v. Chevron U.S.A., Inc*., 544 U.S. 528,

15   542 (2005).  In this case, Plaintiffs have alleged improper, arbitrary and irrational conduct

16   by the County.  There is no allegation in this case that Pima County engaged in legitimate

17   regulation for a public purpose which caused harm to the Plaintiffs.  If Plaintiffs' lots

18   diminished in value, the various alleged causes for this harm – WSP's negligence, the

19   negligence of various engineers and contractors, the negligence of the County – are all

20   related to privatized development and the regulation of privatized development.

21        In sum, Plaintiffs do not state a valid takings claim under any takings theory, and Pima

22   County is entitled to summary judgment on this claim.

23   **2.    Pima County is entitled to summary judgment on Plaintiffs' substantive due
     process claim**

24

25        In order to state a claim for substantive due process, Plaintiffs must allege that Pima

26   County engaged in arbitrary and irrational conduct that deprived Plaintiffs of a legally

     cognizable interest in their real property.  *See Lingle*, 544 U.S. at 542 (holding that

27   "deprivation of real property, although it would no longer constitute a taking, might be so

28   arbitrary or irrational that it runs afoul of the Due Process Clause").  In the present case,

9

1   Plaintiffs have alleged that the County acted arbitrarily in failing to perform its alleged

2   regulatory duties, *ie*. overseeing construction of the Enclaves to ensure timely completion of

3   the improvements.  However, Plaintiffs' substantive due process claim is precluded by the

4   holding in *Shanks v. Dressel*, 540 F.3d 1082 (9th Cir. 2008).   In *Shanks*, a group of

5   homeowners sued the city, alleging that its failure to enforce historic preservation regulations

6   against a developer violated the homeowners' constitutionally-protected property interests.

7   The Court rejected the homeowners' substantive due process claim, holding that

8   "failure-to-protect" and "failure-to-enforce" allegations do not give rise to a substantive due

9   process claim.  As the *Shanks* court stated: "The Constitution generally does not require the

10  state to 'protect the life, liberty, and property of its citizens against invasion by private

11  actors.' *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 195 (1989).

12  Consequently, the state's failure to protect an individual from 'harms inflicted by persons not

13  acting under color of law' will not ordinarily give rise to § 1983 liability. *Huffman v. County*

14  *of Los Angeles*, 147 F.3d 1054, 1058 (9th Cir.1998)." *Id*. at 1087.  Like the homeowners in

15  *Shanks*, Plaintiffs have alleged merely a "failure to protect" claim against Pima County, *ie*.

16  that applicable statutes and regulations should have compelled Pima County to ensure

17  completion of the Enclaves after WSP failed to provide Plaintiffs with the completed lots that

18  Plaintiffs believed they were purchasing.  The Constitution does not impose upon the County

19  a duty to protect Plaintiffs from untimely and substandard work by third parties.[7]

20  Accordingly, Pima County is entitled to summary judgment on Plaintiffs' substantive due

21  process claim.

22  ///

23  ///

24  ///

25  ///

26

27      [7] Because the Court concludes that Plaintiffs substantive due process claim is clearly
    precluded by the holding in *Shanks*, it does not consider Pima County's alternate arguments that
28  Pima County cannot be held liable in *respondeat superior* for the conduct of its employees or
    that Pima County's actions were rationally related to a legitimate governmental purpose.

10

**3.    Pima County is entitled to summary judgment on Plaintiffs' gross negligence claim**

A.R.S. § 12-820.02 provides qualified immunity to the County for any actions other than those which allege that the County acted with intent to cause harm or with gross negligence.[8]  Although it is captioned as a claim for gross negligence, Plaintiffs' third count against Pima County amounts to a mere negligence claim and is barred by A.R.S. § 12-820.02.[9]  (Doc. 136, pgs. 20-22.)  In order to state a claim for gross negligence, Plaintiffs must allege that Pima County acted or failed to act when it knew or had reason to know facts which would lead a reasonable person to realize that its conduct not only created an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result.  *See Walls v. Arizona Dept. of Public Safety,* 170 Ariz. 591, 595, 826 P.2d 1217, 1221 (Ariz.App. 1991).  Plaintiffs have not alleged an unreasonable risk of bodily harm or presented a triable issue of fact that the County created such a risk.[10]  Instead, Plaintiffs claim damages consisting solely of "defective grading and cuts, destruction of utility lines and erosion of Plaintiffs' properties left exposed to the elements for some four years."  (Doc. 284, pg. 28.)  Accordingly, Pima County is entitled to summary judgment on Plaintiffs' negligence claim.

---

[8] A.R.S. § 12-820.02 provides qualified immunity to the County for "the issuance of or failure to revoke or suspend any permit, license, certificate, approval, order or similar authorization for which absolute immunity is not provided pursuant to § 12-820.01."  Plaintiffs' contention that A.R.S. § 12-820.02 does not apply is without merit. (Doc. 292, pg. 3.)  In support of their assertion, Plaintiffs cite to *Watson v. Apache County*, 218 Ariz. 512 (App. 2008).  That case involved informal advice given by employees of the County Assessor's Office; it is wholly inapplicable to the present case.  Plaintiffs' negligence allegations arise from the County's approval of plans, approval of assurances, and enforcement of assurances.  (Doc. 136, pg. 21.)  The challenged actions of the County fall squarely within the ambit of A.R.S. § 12-820.02.

[9] Notably, Plaintiffs appear to acknowledge that their claim amounts to simple negligence by seeking summary judgment under a simple negligence theory and citing negligence law. (Doc. 276, p. 7-8.)

[10] Plaintiffs' footnoted contention that a showing of risk of bodily harm is not a required element of a gross negligence claim is not supported by citation to any applicable law. (Doc. 276, pg. 13, n.1 and Doc. 292, pg. 6, citing to California law, a 1887 decision from Territory of Arizona, and several disbarment proceedings).  In addition, the Court notes that it previously alerted Plaintiffs to this deficiency in their gross negligence claim in a Report and Recommendation filed on June 24, 2008.  (Doc. 97.)

11

**4.    Pima County is entitled to summary judgment on Plaintiffs' promissory estoppel claim**

In order to state a claim for promissory estoppel, Plaintiffs must demonstrate that: (1) the County made a promise to Plaintiffs; (2) the County should have reasonably foreseen that Plaintiffs would rely on that promise; (3) Plaintiffs did in fact rely on that promise and (4) Plaintiffs' reliance was justified. *See Double AA Builders, Ltd. v. Grand State Const. L.L.C.,* 114 P.3d 835, 839 (Ariz. App. 2005). If these elements are proven, the promise "is binding if injustice can be avoided only by enforcement of the promise." *See id.* Plaintiffs contend that the Initial Assurance Agreement constituted a promise by the County to Plaintiffs that the Enclave improvements would be completed; Plaintiffs further allege that the County should have reasonably foreseen that Plaintiffs would rely on the Initial Assurance Agreement when purchasing their lots.[11] Plaintiffs' promissory estoppel claim fails for several reasons. First, the Initial Assurance Agreement did not constitute a promise to Plaintiffs. The Initial Assurance Agreement, on its face, was a contract between the County and WSP whereby WSP assured completion of the Subdivision Improvements and WSP agreed not to transfer title to the Enclave lots without obtaining a Release of Assurance from the County. (Doc. 136-2, pg. 2.) Second, to the extent Plaintiffs relied on the Initial Assurance Agreement at the time they purchased their lots, such reliance was not reasonable. The Initial Assurance Agreement expressly provided that WSP could submit substitute assurances at any time. The County subsequently recorded a Release which referred to "substitute assurances in the form of a Performance Bond" and provided that, based on the provision of substitute assurances, the Pima County Board of Supervisors approved the transfer of title to lots in the Enclave. Thus, Plaintiffs were on notice that the Initial Assurance Agreement had been modified. In addition, it is undisputed that, at the time Plaintiffs purchased their lots, the Enclave improvements were not complete. Given that the

---

[11] It is unclear whether Plaintiffs intend to argue for the first time in their Response to Pima County's Motion for Summary Judgment that their promissory estoppel claim is also based on the County's alleged promise to call the bond at some point after November 2007. (Doc. 284, pg.30.) If so, the Court declines to consider an argument raised for the first time after the close of discovery and at the summary judgment stage. *See Coleman v. Quaker Oats Co.*, 232 F3d 1271, 1292 (9th Cir. 2000).

Initial Assurance Agreement stated that transfer of title could not occur until improvements were complete, it was not reasonable for Plaintiffs to rely on that Agreement while purchasing their lots.   Accordingly, Pima County is entitled to summary judgment on Plaintiffs' promissory estoppel claim.

**RECOMMENDATION**

For the foregoing reasons, the Magistrate Judge recommends the District Court, after is independent review of the record, enter an order:

1.      DENYING the Motion for Partial Summary Judgment filed by Plaintiffs on October 15, 2010 (Doc. 276);

2.      GRANTING the Motion for Summary Judgment filed by Defendant Pima County on October 18, 2010 (Doc. 279.);

3.      Awarding judgment in favor of Pima County and directing the Clerk of the Court to close the file in this matter.

Pursuant to 28 U.S.C. § 636(b), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation.   If objections are not timely filed, they may be deemed waived.   If objections are filed, the parties should use the following case number: **CV-08-09-TUC-FRZ.**

DATED this 20th day of January, 2011.

_____
Jennifer C. Guerin
United States Magistrate Judge

13